SEALED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

UNITED STATES OF AMERICA, and STATES AND COMMONWEALTHS OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, and THE DISTRICT OF COLUMBIA,

*ex rel.* OMNI HEALTHCARE, INC.,

Plaintiffs,

v.

THERMO FISHER SCIENTIFIC, INC., BLACKFLY INVESTMENTS, LLC d/b/a MOLECULAR TESTING LABS, SOUTHWEST REGIONAL PCR, LLC d/b/a MICROGENDX, 3RX HOLDINGS INC., MED HEALTH SERVICES MANAGEMENT, LP d/b/a MED HEALTH SERVICES LABS, ACCU REFERENCE MEDICAL LAB, LLC, REALTOX LABS, LLC d/b/a REAL DIAGNOSTICS LABS, AMERICAN INSTITUTE OF TOXICOLOGY, INC d/b/a AIT LABORATORIES A HEALTHTRACKRX COMPANY, DX SOLUTIONS, LLC, D/B/A SOLARIS DIAGNOSTICS, VIKOR SCIENTIFIC, LLC, GENE TOX WORLDWIDE LLC d/b/a TRUGENX PRECISION MEDICINE, POPLAR HEALTHCARE, PLLC, MATIAS CLINICAL LABORATORY INC d/b/a HEALTH CARE PROVIDERS LABORATORY INC, WELLSPRING USA, LLC d/b/a GENESIS

**Civ. Action No. 3-22CV1710-E**

**Hon. Ada Brown, U.S.D.J.**

**FIRST AMENDED COMPLAINT**

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2**

**JURY TRIAL DEMANDED**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
NOV - 9 2022
CLERK, U.S. DISTRICT COURT
By ______ Deputy

REFERENCE LABORATORIES, NOVA LABS LLC, RCA LABORATORY SERVICES, LLC d/b/a GENETWORX, MEDARBOR LLC d/b/a MEDARBOR DIAGNOSTICS, PRECISION LIFE SCIENCES, LLC, ISPM LABS, LLC d/b/a CAPSTONE DIAGNOSTICS, LLC., HELIX BIOANALYTICAL TESTING LABORATORY LLC d/b/a HELIX BIOLAB, JOHN DOE OWNERS 1-18 and JOHN DOE MEDICAL DIRECTORS 1-18

Defendants.

## FIRST AMENDED *QUI TAM* COMPLAINT

Plaintiff-Relator OMNI Healthcare, Inc., ("OMNI" or "Relator") through and by its attorneys, Spiro Harrison, on behalf of the United States of America (the "Government") and the States and Commonwealths of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of Columbia, (collectively, the "States") (together, the Governments) files this First Amended qui tam Complaint against Defendants Thermo Fisher Scientific, Inc., ("Thermo Fisher"), Blackfly Investments, LLC d/b/a Molecular Testing Labs, Southwest Regional PCR d/b/a MicroGenDX, 3RX Holdings Inc., Med Health Services Management, LP d/b/a Med Health Services Labs, ACCU Reference Medical Lab, LLC, REALTOX Labs, LLC d/b/a Real Diagnostics Labs, American Institute of Toxicology, Inc. d/b/a AIT Laboratories A HealthtrackRX Company, Dx Solutions, LLC, d/b/a Solaris Diagnostics, Vikor Scientific, LLC, Genetox Worldwide LLC d/b/a TruGenX Precision Medicine, Poplar Healthcare, PLLC, Matias Clinical Laboratory Inc. d/b/a Health Care Providers Laboratory, Inc.,Wellspring USA, LLC, d/b/a Genesis Reference

Laboratories. Nova Labs LLC, RCA Laboratory Services, LLC d/b/a GENETWORx, MedArbor LLC d/b/a MedArbor Diagnostics, Precision Life Sciences, LLC, ISPM Labs, LLC d/b/a Capstone Diagnostics LLC, and Helix Bioanalytical Testing Laboratory LLC d/b/a Helix BioLab (collectively, the "Diagnostic Labs"), John Doe Owners 1-18 (collectively the "Owners") and John Doe Medical Directors 1-18 (the "Medical Directors") (together, "Defendants").

Relator brought this action on behalf of the Governments to recover treble damages and civil penalties arising from Defendants' fraudulent conduct, including false and/or fraudulent records, statements and claims made and caused to be made by Defendants and/or their agents, employees, and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* and the States' False Claims Acts and insurance fraud prevention laws. Defendants knowingly billed and caused others to bill government healthcare programs, including Medicare, Medicaid and CHAMPUS/TRICARE, as well as private healthcare insurers regulated by the States of California and Illinois, for non-reimbursable experimental diagnostic tests (which further more were medically unnecessary), and submitted and caused others to submit claims for payment that were tainted by violations of the Anti-Kickback Statute ("AKS") (42 U.S.C. § 1320a-7b(b)), the Eliminating Kickbacks in Recovery Act ("EKRA"), 18 U.S.C. § 220(a), the Stark Law, the federal anti-markup rule and their state law analogues.

## INTRODUCTION

1. From in or about at least 2015 through the present, Thermo Fisher has violated and continues to violate the FCA by marketing the "Real-Time PCR Solution for Urinary Tract Microbiota (UTM) Detection" (the "Solution"), and diagnostic testing products using the Solution's experimental technology to commercial diagnostic laboratories, healthcare providers and other facilities. Contrary to its marketing messaging, Thermo Fisher knows that the highly-

priced diagnostic tests based on the Solution are not clinically superior to, and indeed produce wildly varying and inaccurate results compared to, much cheaper traditional culture-based diagnostic tests for urinary tract infection ("UTI").

2. Thermo Fisher's marketing of the Solution and UTI diagnostic test products is misleading and fraudulent, in that among other things Thermo Fisher and its marketing partners openly and aggressively target commercial diagnostic labs and practicing clinicians while falsely disclaiming that the Solution and Solution-derived products are intended only for experimental and scientific research use. Thermo Fisher and its marketing partners also instruct these commercial customers how to bill Government healthcare programs and private third-party payors for otherwise non-covered tests in a manner which will result in generous and highly profitable reimbursement.

3. Accordingly, Thermo Fisher has fraudulently submitted, and caused to be submitted, materially false claims for reimbursement to state and federal government healthcare programs for diagnostic tests using the Solution's technology.

4. The Diagnostic Labs are commercial diagnostic labs, not scientific or medical research facilities. In collaboration with Thermo Fisher and others, the Diagnostic Labs and their Owners and Medical Directors knowingly and fraudulently marketed, promoted, and performed diagnostic UTI tests based on the Solution that were not medically necessary, were experimental, and not clinically superior to culture-based tests. They engaged in this wrongdoing because the reimbursement rates for these tests were many multiples of the rates for traditional culture-based tests, sometimes several hundred dollars.

5. Relator determined that the Solution-based diagnostic tests are wildly inaccurate, to the point of being clinically useless. Relator sent urine samples from two patients to twelve

different Diagnostic Labs. For the first patient, only three labs returned positive results for E. Coli (the most common organism causing UTIs). From the second patient's sample, all twelve labs returned different test results.

6. The Diagnostic Labs effectively paid kickbacks to referring physicians and practice groups to induce and/or reward their test orders by billing them for diagnostic tests at prices significantly below (in some cases as much as 80% less than) the generous reimbursements physicians and practice groups could obtain from Government programs and private healthcare insurance. This scheme also violated anti-markup rules.

7. The Diagnostic Labs also effectively paid kickbacks by waiving or otherwise not charging patients for deductibles and co-pays due to Government programs and private healthcare insurance.

8. The Diagnostic Labs also effectively paid kickbacks by discounting fees charged to private healthcare insurers in exchange for referring physicians and practice groups' referring all of their Government-covered patients' tests to them.

9. Furthermore, Defendants' misconduct endangered patients' health and safety by, *inter alia*, causing ineffectual and/or unnecessary antibiotics to be prescribed and thereby delaying or otherwise altering the appropriate antibiotic treatment to fight UTI and/or promoting antibiotic resistance in particular patients and more generally in the public.

10. By this First Amended *qui tam* Complaint, Relator, on behalf of itself and the Government, now seeks to hold Defendants liable for their knowing violations of the FCA, as amended, and its state-law counterparts, as set forth below. Relator and the Governments seek treble damages, civil penalties and all other recoveries provided under the federal and state FCAs arising from Defendants' misconduct.

**PARTIES**

11. Relator OMNI Healthcare, Inc. is a multi-specialty medical professional group with seven locations, all located in Brevard County, Florida. Formed in 1994, it practices through physicians in the central Florida region and specializes in multiple fields, including endocrinology/diabetes, family medicine, hematology/oncology, internal medicine, orthopedic surgery, pediatrics, radiation oncology, radiology, rheumatology, and urgent care. More than twenty medical professionals deliver medical services at OMNI Healthcare's locations. Additionally, relator operates a high complexity CLIA certified laboratory and relator's principal has served as a laboratory director for numerous laboratories during the last thirty years.

12. Thermo Fisher is a worldwide provider of analytical instruments, equipment, reagents and consumables, software and services for research, manufacturing, analysis, discovery and diagnostics. Thermo Fisher's products are utilized in a variety of settings, including pharmaceutical and biotech companies, hospitals and clinical diagnostic labs, universities, research institutions, government agencies, and environmental and process control industries.

13. Thermo Fisher is a Delaware corporation domiciled in the State of Massachusetts, with its principal place of business at 81 Wyman Street, Waltham, Massachusetts 02451. Thermo Fisher does business throughout the United States, including in the Northern District of Texas, where it maintains places of business at 4951 Langdon Road, Dallas, Texas 75241, and 1321 North Plano Road, Richardson, Texas 75081.

14. Thermo Fisher markets and sells many of its products in the United States, including its PCR utilizing UTM testing panels.

15. Defendants Blackfly Investments, LLC d/b/a Molecular Testing Labs, Southwest Regional PCR d/b/a MicroGenDX, 3RX Holdings Inc., Med Health Services Management, LP d/b/a Med Health Services Lab, ACCU Reference Medical Lab, LLC, REALTOX Labs, LLC d/b/a Real Diagnostics Labs, American Institute of Toxicology, Inc. d/b/a AIT Laboratories A HealthtrackRX Company, Dx Solutions, LLC, d/b/a Solaris Diagnostics, Vikor Scientific, LLC, Genetox Worldwide LLC d/b/a TruGenX Precision Medicine, Poplar Healthcare, PLLC, Matias Clinical Laboratory Inc. d/b/a Health Care Providers Laboratory, Inc., Wellspring USA, LLC d/b/a Genesis Reference Laboratories, Nova Labs LLC, RCA Laboratory Services, LLC d/b/a GENETWORx, MedArbor LLC d/b/a MedArbor Diagnostics, Precision Life Sciences, LLC, ISPM Labs, LLC d/b/a Capstone Diagnostics LLC, and Helix Bioanalytical Testing Laboratory LLC d/b/a Helix BioLab are commercial diagnostic laboratories that submitted or, by participating in Thermo Fisher's fraudulent scheme, caused the submission of claims for clinical laboratory services that were medically unnecessary, kickback-tainted and/or otherwise provided in violation of federal and state regulations and commercial insurance rules, regulations and contracts.

16. Defendant Blackfly Investments, LLC d/b/a Molecular Testing Labs is domiciled in the State of Washington with its principal place of business at 14401 SE 1st Street, Vancouver, Washington 98684.

17. Defendant Southwest Regional PCR d/b/a MicroGenDX is domiciled in the State of Texas with its principal place of business at 2002 W Loop, Ste 116, Lubbock, Texas, 79407.

18. Defendant 3RXHoldings, Inc., is domiciled in the State of Florida with its principal place of business at 5801 N. Congress Ave., Boca Raton, Florida 33487.

19. Defendant Med Health Services Management, LP d/b/a Med Health Services Lab ("MHS Labs"), is domiciled in the State of Pennsylvania with its principal place of business at 200 James Pl, 2nd Floor, Monroeville, Pennsylvania 15146.

20. Defendant ACCU Reference Medical Lab, LLC, is domiciled in the State of New Jersey with its principal place of business at 1901 E Linden Ave, Suite 4, Linden, New Jersey 07036.

21. Defendant REALTOX Labs, LLC d/b/a Real Diagnostics Labs, is domiciled in the State of Maryland with its principal place of business at 200 Business Center Drive, Reisterstown, Maryland 21136.

22. Defendant American Institute of Toxicology, Inc. d/b/a AIT Laboratories A HealthtrackRX Company, is domiciled in the State of Texas with its principal place of business at 1500 Interstate 35, W Denton, Texas 76207.

23. Defendant Dx Solutions, LLC, d/b/a Solaris Diagnostics, is domiciled in the State of Kentucky with its principal place of business at 110 Dewey Drive, Ste A, Nicholasville, Kentucky 40356.

24. Defendant Vikor Scientific, LLC, is domiciled in the State of South Carolina with its principal place of business at 22 West Edge Street, 8th floor, Charleston, South Carolina, 29403.

25. Defendant Genetox Worldwide LLC d/b/a TruGenX Precision Medicine is a Delaware corporation domiciled in the State of New Jersey with its principal place of business at 136 Ridge Road, Lyndhurst, New Jersey 07071.

26. Defendant Poplar Healthcare, PLLC, ("Bostwick/Poplar") is domiciled in the State of Tennessee with its principal place of business at 3495 Hacks Cross Road, Memphis, Tennessee 38125.

27. Defendant Matias Clinical Laboratory Inc. d/b/a Health Care Providers Laboratory, Inc., is domiciled in the State of California and its principal place of business at 14411 Palmrose Street, Baldwin Park, California 91706

28. Defendant Wellspring USA, LLC, d/b/a Genesis Reference Laboratories is domiciled in the State of Florida with its principal place of business at 7924 Forest City Road, #210, Orlando, Florida 32810.

29. Defendant Nova Labs LLC is domiciled in the State of California with its principal place of business at 1050 Las Tablas Road, Suite 14, Templeton, California 93465.

30. Defendant RCA Laboratory Services, LLC d/b/a GENETWORx ("GENETWORx") is domiciled in the State of Virginia with its principal place of business at 4060 Innslake Drive, Glen Allen, Virginia 23060.

31. Defendant MedArbor LLC d/b/a MedArbor Diagnostics is domiciled in the State of Pennsylvania with its principal place of business at 200 Rittenhouse Circle, Suite E1, Bristol Township, Pennsylvania 19007.

32. Defendant Precision Life Sciences, LLC, is domiciled in the State of New Hampshire with its principal place of business at 25 Pelham Road, Salem, New Hampshire 03079.

33. Defendant ISPM Labs, LLC d/b/a Capstone Diagnostics LLC, is domiciled in the State of Georgia with its principal place of business at 8601 Dunwoody Pl, Suite 44, Atlanta, Georgia 30350.

34. Defendant Helix Bioanalytical Testing Laboratory LLC d/b/a Helix BioLab is domiciled in the State of Michigan with its principal place of business at 28044 James Drive, Warren, Michigan 48092.

35. Defendants John Doe Owners 1-18 are the owners of the Diagnostic Labs. As of the filing of this First Amended Complaint, their specific identities remain unknown despite Relator's and counsel's due diligence.

36. Defendants John Doe Medical Directors 1-18 are the Medical Directors of the Diagnostic Labs. As of the filing of this First Amended Complaint, their specific identities remain unknown despite Relator's and counsel's due diligence.

## JURISDICTION AND VENUE

37. This Court has jurisdiction over the subject matter of this FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has jurisdiction over the subject matter of the state law claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the state law claims arise from the same transactions or occurrences as the FCA claims.

38. This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. During the relevant time period of this First Amended Complaint, the Defendant maintained places of business and transacted business in the District of New Jersey, and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

39. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendant maintains places of business and transacts business in the Northern District of Texas

and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

40. In accordance with 31 U.S.C. § 3730(b)(2), the original Complaint was filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendant until the Court so orders.

41. Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint (and any Amended Complaint) and a written disclosure of substantially all material evidence and material information in its possession contemporaneous with the filing of the Complaint.[1] Relator has complied with this provision by serving its disclosure and copies of the original Complaint and this First Amended Complaint upon the Honorable Chad E. Meacham, United States Attorney for the Northern District of Texas and upon the Honorable Merrick B. Garland, Attorney General of the United States, and upon the States as prescribed by their respective analogue statutes.

42. Relator is not aware that the allegations in this First Amended Complaint have been publicly disclosed. Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" because it has provided this information voluntarily to the Governments before filing the original Complaint and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

[1] Numerous examples of patient test results from physicians and diagnostic laboratories, and evidence of claims submission to and payment by government-funded healthcare programs, were included in the statutory disclosure materials provided to the United States and the States accompanying the filing of the original Complaint. To protect the confidentiality of the patients and their private healthcare information, those records are not detailed in this First Amended Complaint, but are incorporated herein by reference.

## GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT

### A. THE FALSE CLAIMS ACT

43. Originally enacted in 1863, Congress substantially amended the FCA in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States. Further clarifying amendments were adopted in May 2009 and March 2010.

44. The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. 3729(a)(1)(A), (B), (G).

45. The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015, $10,781 to $21,563 for each such claim submitted after November 2, 2015, $11,803 to $23,607 for each such claim submitted between December 13, 2021, and January 12, 2022, and $12,537 to $25,076 for each such claim submitted after January 12, 2022, as well as three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal, without service

on the defendant. The complaint remains under seal while the Government conducts an investigation of the complaint's allegations and determines whether to join the action.

46. Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. 3729(b)(1).

47. The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that — (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government — (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

48. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any Defendant.

49. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

## B. THE ANTI-KICKBACK STATUTE

50. The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, makes it a criminal offense to "knowingly and willfully" offer, pay, solicit or receive any remuneration to induce

referrals of items or services paid for by Government health care programs. Specifically, the AKS provides:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program
>
> * * *
>
> (2) whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b).

51. Specific intent is not required to establish a violation of the AKS. 42 U.S.C. § 1320(a)-7b(h).

52. A "[f]ederal health care program" is defined as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The AKS applies to claims submitted by Defendants to programs including Medicare, Medicaid, TRICARE/CHAMPUS and the Veterans Administration.

### C. THE ELIMINATING KICKBACKS IN RECOVERY ACT

53. The federal Eliminating Kickbacks in Recover Act ("EKRA"), enacted on or about October 24, 2018, makes it a crime for anyone to knowingly and willfully (1) solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a patient or patronage to a . . . clinical treatment facility, or laboratory, with respect to services covered by a health care benefit program, in and affecting interstate and foreign commerce. 18 U.S.C. § 220(a).

54. Federal law defines "laboratory" for purposes of EKRA as "a facility for the biological, microbiological, serological, chemical, immuno-hematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings." 42 U.S.C. § 263a(a).

55. EKRA has been held to "appl[y] to situations where someone 'pays or offers any remuneration,' to 'induce' an individual into using laboratory or clinical services," whether directly or through another person or entity such as a marketer. *United States v. Schena*, No. 5:20-cr-00425-EJD-1, 2022 U.S. Dist. LEXIS 96051, at *10 (N.D. Cal. May 28, 2022).

### D. THE STARK LAW

56. The Stark Law prohibits an entity from submitting claims to Medicare for certain categories of "designated health services" (DHS), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not satisfy the requirements of an applicable statutory or regulatory exception. 42 U.S.C. § 1395nn(a)(1). The Stark Law further prohibits Medicare from paying any claims for DHS

referred in violation of the law. 42 U.S.C. § 1395nn(g)(1). The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to overutilization of DHS, patient steering, and the corruption of physicians' medical judgment by improper financial incentives.

57. As initially enacted in 1989, the Stark Law applied to referrals of Medicare patients for clinical laboratory services by a physician to a laboratory with which the physician had a financial relationship unless the requirements of an applicable statutory or regulatory exception were satisfied. See Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6204, 103 Stat. 2106, 2236-43. In 1993, Congress extended the Stark Law's application to referrals for ten additional DHS. See Omnibus Reconciliation Act of 1993, Pub. L. No. 103-66, § 13562, 107 Stat. 312, 596-605; Social Security Act Amendments of 1994, Pub. L. No. 103-432, § 152, 108 Stat. 4398, 4436-37.

58. Compliance with the Stark Law is a condition of payment by the Medicare program. Medicare is prohibited from paying for any DHS provided in violation of the Stark Law. See 42 U.S.C. §§ 1395nn(a)(1), (g)(1). Moreover, "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis[.]" 42 U.S.C. § 411.353(d).

59. In pertinent part, the Stark Law provides:

> (a) Prohibition of certain referrals
>
> (1) In general
>
> Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

60. Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [i]s the person or entity that has performed services that are billed as DHS or . . . that has presented a claim to Medicare for the DHS, including the person or entity to which the right to payment for the DHS has been reassigned. . . ." 42 C.F.R. § 411.351 (2014).

61. A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. 42 U.S.C. §§ 1395nn(h)(1)(A), (h)(1)(B); 42 C.F.R. § 411.351 (2014).

62. A direct compensation arrangement exists "if remuneration passes between the referring physician . . . and the entity furnishing DHS without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1)(i) (2014).

63. An indirect compensation arrangement exists if (i) there is an unbroken chain of persons or entities that have financial relationships between the referring physician and the entity furnishing DHS; (ii) the referring physician receives from the person or entity with whom the physician has a direct financial relationship aggregate compensation that varies with, or otherwise takes into account, the volume or value of the physicians' referrals to, or other business generated by the referring physician for, the entity furnishing the DHS; and (iii) the entity furnishing the DHS has knowledge of the fact that the referring physician (or immediate family member) receives

aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS. See 42 C.F.R. § 411.354(c)(2) (2014).

64. For purposes of the Stark Law, a "referral" includes any request by a physician for, or ordering of, or the certifying or recertifying of the need for, any DHS for which Medicare payment may be made, including a request for a consultation with another physician and any test or procedure ordered by or to be performed by (or under the supervision of) that other physician, but does not include any DHS personally performed by the referring physician. 42 U.S.C. § 1395nn(h)(5); 42 C.F.R. § 411.351 (2014).

65. "Other business generated" means "any other business generated by the referring physician, including other Federal and private pay business." 66 Fed. Reg. 856, 877 (Jan. 4, 2001).

66. Compensation is "deemed not to take into account 'other business generated between the parties,' provided that the compensation is fair market value for items and services actually provided and does not vary during the course of the compensation arrangement in any manner that takes into account referrals or other business generated by the referring physician, including private pay healthcare business. . . ." 42 C.F.R. § 411.354(d)(3) (2014).

67. The Stark Law is a strict liability statute, with no scienter element. Those who knowingly submit or cause to be submitted claims to Medicare in violation of the Stark Law also violate the FCA. A knowing violation of the Stark Law also may result in exclusion from federal healthcare programs. 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

### E. THE ANTI-MARKUP RULE

68. In 2004, CMS raised concerns about possible exploitation by some providers of loopholes in the Medicare billing and self-referral provisions.

69. CMS noted that "Medicare rules currently prohibit the markup of the technical component of certain diagnostic tests that are performed by outside suppliers and billed to Medicare by a different individual or entity (§ 414.50)." 72 Fed. Reg. 38122, 38179 (Jul. 12, 2007).

70. CMS "expressed concern that allowing physician group practices . . . to purchase or otherwise contract for the provision of diagnostic testing services and then realize a profit when billing Medicare may lead to patient and program abuse in the form of overutilization of services and result in higher costs to the Medicare program." *Id.* (citing 71 Fed. Reg. 49054).

71. Accordingly, CMS "impose[d] an anti-markup provision on the [technical component] and [professional component] of diagnostic tests."

> We would apply the anti-markup provision irrespective of whether the billing physician or medical group outright purchases the PC or the TC, or whether the physician or other supplier performing the TC or PC reassigns his or her right to bill to the billing physician or medical group (unless the performing supplier is a full-time employee of the billing entity). To prevent gaming, whereby the performing physician's or other supplier's net charge to the billing entity is inflated to cover the cost of equipment or space that is leased to the performing physician or other supplier, we would define "net charge" as exclusive of any amount that takes into consideration such charges.

72. CMS's anti-markup regulation provides:

> [I]f a physician or other supplier bills for the technical component (TC) or professional component (PC) of a diagnostic test that was ordered by the physician or other supplier (or ordered by a party related to such physician or other supplier through common ownership or control as described in § 413.17 of this chapter) and the diagnostic test is performed by a physician who does not share a practice with the billing physician or other supplier, the payment to the billing physician or other

> supplier (less the applicable deductibles and coinsurance paid by the beneficiary or on behalf of the beneficiary) for the TC or PC of the diagnostic test may not exceed the lowest of the following amounts:
>
> (i) The performing supplier's net charge to the billing physician or other supplier. For purposes of this paragraph (a)(1) only, with respect to the TC, the performing supplier is the physician who supervised the TC, and with respect to the PC, the performing supplier is the physician who performed the PC.
>
> (ii) The billing physician or other supplier's actual charge.
>
> (iii) The fee schedule amount for the test that would be allowed if the performing supplier billed directly.

42 C.F.R. § 414.50.

73. In short, the Anti-Markup rule prohibits physicians and other providers from profiting by charging a Government healthcare program more than what the diagnostic lab actually charges for conducting a test (the TC) and providing the results (the PC).

Several states, including California, Florida, Illinois, Michigan, Oregon, Pennsylvania, Utah, Virginia, and Washington, have enacted analogous anti-markup and/or direct-billing laws.

### F. VIOLATIONS OF THE AKS, THE STARK LAW, AND THE ANTI-MARKUP RULE CAN GIVE RISE TO FCA LIABILITY.

74. Congress has long viewed the elimination of kickbacks and other financial incentives as central to any efforts to combat fraud and abuse in government-funded healthcare programs. Courts have held that a person or entity that violates the AKS and subsequently submits a claim for payment or causes another to do so has violated the FCA, regardless of what form the claim or statement takes. Courts have reasoned that such claims are false because there is a false certification attached to them—either express or implied—as to compliance with the AKS each time a tainted claim is submitted.

75. Defendants violated the AKS by offering remuneration and incentives, in various forms, to physicians to induce them to order tests reimbursible by Medicare. Medicare does not cover services that are provided because of illegal inducements. All claims for payment for those tests are false.

76. In 2010, under the Patient Protection and Affordable Care Act, Congress amended the AKS to expressly clarify that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA.

77. Stark Law is a strict liability statute, with no scienter element. Those who knowingly submit or cause to be submitted claims to Medicare in violation of the Stark Law also violate the FCA. A knowing violation of the Stark Law also may result in exclusion from federal healthcare programs. 42 U.S.C. §§ 1395nn.

78. Similarly, the Anti-Markup Rule applies broadly to prohibit providers from charging third-party payors more than the actual cost of a diagnostic test.

## G. FEDERALLY-FUNDED HEALTH INSURANCE PROGRAMS

### 1) Medicare

79. Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing both hospital insurance, Medicare Part A, which covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical insurance, Medicare Part B, which covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician.

80. Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

81. Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services. CMS establishes rules for the day-to-day administration of Medicare. CMS contracts with private companies to handle day-to-day administration of Medicare.

i. CMS, through contractors, maintains and distributes fee schedules for the payment of physician services. These schedules specify the amounts payable for defined types of medical services and procedures. Reasonable and Necessary Services

82. All claims for Medicare reimbursement must be justified by medical need. "No payment may be made under Part A or Part B for any expenses incurred for items or services . . . which are not reasonable or necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. §1395y(a)(1)(A).

83. Claims for reimbursement cannot exceed the medical needs of the patient and must be economical. "It shall be the obligation of any health care practitioner and any other person (including a hospital or other health care facility, organization, or agency) who provides health care services for which payment may be made (in whole or in part) under this Act, to assure, to the extent of his authority, that services or items ordered or provided by such practitioner or person to beneficiaries and recipients under this Act— (1) will be provided economically and only when, and to the extent, medically necessary[.] . . ." 42 U.S.C. §1320c-5(a).

84. A medically necessary service is one that, amongst other things, is "appropriate, including the duration … that is considered appropriate for the service, in terms of whether it is furnished in accordance with accepted standards of medical practice . . . [and is] one that meets, but does not exceed, the patient's medical need." Medicare Program Integrity Manual, Chapter 13, § 13.5.1.

85. The Medicare Claims Processing Manual further explains that "[i]f a service is not reasonable and necessary to treat illness or injury for any reason (including lack of safety and efficacy because it is an experimental procedure, etc.), carriers consider the service noncovered notwithstanding the presence of a payment amount for the service in the Medicare fee schedule." Medicare Claims Processing Manual, Chapter 23, § 30(A).

**2) TRICARE**

86. TRICARE is a federal program which provides civilian health benefits for military personnel, military retirees, and their families. TRICARE is administered by the Department of Defense and funded by the federal government. At all relevant times to the Complaint, applicable TRICARE regulations relating to coverage of claims by Defendant have been substantially similar in all material respects to the Medicare provisions described above.

**3) Medicaid**

87. Medicaid is a state and federal assistance program to provide payment of medical expenses for low-income patients. Medicaid was created in 1965 in Title XIX of the Social Security Act.

88. Funding for Medicaid is shared between the federal government and state programs that choose to participate in Medicaid.

89. At all relevant times to the Complaint, applicable Medicaid regulations relating to coverage of claims by Defendant have been substantially similar in all material respects to the Medicare provisions described above.

### H. GENERAL RULES GOVERNING LABORATORY SERVICES

90. Medicare, Medicaid, and other government-funded healthcare programs will only pay for diagnostic tests that are ordered by a physician treating the patient for a specific illness or injury. Test orders that are not individualized to patient need (or for which the need is not

documented in the patient chart) are not considered to be covered services and claims for such services will be denied.

91. Under the Medicare program, laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

92. Medicare Part B pays for covered diagnostic tests that are furnished by a laboratory. 42 C.F.R. § 410.32(d)(v). "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition." Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1.

93. Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."

94. Tests not ordered by the beneficiary's treating physician are not considered reasonable and necessary. The MBPM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary. . . . [T]he physician must clearly document, in the medical record, his or her intent that the test be performed." MBPM, Ch. 15, Section 80.6.1.

95. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. *Id.*; 42 C.F.R. § 410.32(a). Clinical laboratory services must be ordered and used by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a). *Id.*

96. In order to assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

97. Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(2-3).

98. The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has published Compliance Program Guidance for Clinical Laboratories. 63 Fed. Reg. 45076 (Aug. 24, 1998) ("Guidance"). The Guidance states that laboratory order forms should emphasize the need for a justification and assessment of each test ordered.

99. HHS-OIG expressly warns about standardized order or requisition forms that encourage or even mislead physicians into ordering more than one test as part of a "panel" when the full "panel" is not medically necessary and/or without giving the physician the option or enough information to understand how to order only those tests that are necessary.

100. Specifically, the Guidance cautions:

> *Requisition design*: While [CMS] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an

> independent medical necessity decision with regard to each test the laboratory will bill. . . .
>
> 4. Reliance on Standing Orders: Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. . . . Medicare contractors can and may require additional documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.

*Id.* at 45079, 45081.

101. HHS-OIG similarly warns about the risk that non-medically necessary tests might be caused by overly broad "reflex testing" policies:

> e. *Reflex testing*: Reflex testing occurs when initial test results are positive or outside normal parameters and indicate that a second related test is medically appropriate. In order to avoid performing unnecessary reflex tests, labs may want to design their requisition form in such a way which would only allow for the reflex test when necessary. Therefore, the condition under which the reflex test will be performed should be clearly indicated on the requisition form. Laboratories may wish to adopt a similar policy for confirmation testing which may be mandatory.

*Id.* at 45081.

## <u>CLINICAL BACKGROUND OF TESTING URINARY TRACT INFECTIONS AND BILLING/REIMBURSEMENT</u>

102. "A bacterial urine culture is a laboratory procedure performed on a urine specimen to establish the probable [cause] of a presumed urinary tract infection." *See* Medicare National Coverage Determinations Manual ("NCDM") ch. 1, part 3 § 190.12. UTIs are among the most common human infections, affecting almost 50% of the population at least once in their lifetime. In the United States, they account for an estimated $3.5 billion in healthcare spending every year. UTIs are primarily caused by bacteria and are thus usually treated with antibiotics.

103. Several tests are available for diagnosing UTIs, including urine dipstick testing, urinalysis, Gram staining, and bacterial urine culture ("BUC"). The BUC is the "gold standard" for establishing a diagnosis of UTIs, because it allows the quantification and identification of the uropathogenic species, and subsequent testing to determine whether the bacteria in question are resistant to one or more antibiotics.

104. "It is common practice to do a urinalysis prior to a urine culture." NCDM § 190.12. The Medicare payment policy (known as a "National Coverage Determination" or "NCD") for BUC testing explains that it may be medically necessary to conduct at BUC where:

> A patient's urinalysis is abnormal suggesting urinary tract infection, for example, abnormal microscopic (hematuria, pyuria, bacteriuria); abnormal biochemical urinalysis (positive leukocyte esterase, nitrite, protein, blood); a Gram's stain positive for microorganisms; positive bacteriuria screen by a non-culture technique; or other significant abnormality of a urinalysis.

*Id.*

105. The NCDM further provides, however, that it "is not essential to evaluate a urine specimen by one of these methods before a urine culture is performed." Instead, "certain clinical presentations with highly suggestive signs and symptoms may lend themselves to an antecedent urinalysis procedure where follow-up culture depends upon an initial positive or abnormal test result." *Id.*

106. Thus, for example, a BUC may be medically necessary if the "patient has clinical signs and symptoms indicative of a possible . . . UTI," such as painful or frequent urination, discolored urine, fever or chills. *See id.*

107. As defined in the NCD, "[t]he procedure includes aerobic agar-based isolation of bacteria or other cultivable organisms present, and quantification of types present based on morphologic criteria." *See id.*

108. Stated simply, the standard practice for BUC involves putting a sample of the urine on one or more types of media (usually in a Petri dish) that provide an opportunity for bacteria to grow. The culture is then incubated for 24 hours. After the first 24 hours, the initial results are documented, including whether any bacteria have grown, how many different types of bacteria have grown, and how big each bacterial colony is (measured in colony-forming units per milliliter of urine or CPU/ml).

109. At this point, the type of bacteria can generally be identified based on the type of medium used, the color of the colony, and other details about the formation and shape of the colony.

110. The presence of three or more bacteria indicates likely contamination of the urine sample. In such cases, further testing on that culture should be discontinued and a new sample collected and tested.

111. Pursuant to Medicare and standard coding rules, the initial BUC test, including baseline bacteria identification and quantification, are billed using CPT Code 87086. In 2022, Medicare paid $8.07 for this code.

112. In some situations, additional conventional laboratory tests may be necessary to identify bacteria type. Such additional testing should be billed using CPT Code 87077, for which Medicare paid $8.08 in 2022.

113. If initial testing indicates the presence of bacteria, then antibiotic resistance testing can be an important part of developing a plan of care because an antibiotic to which the bacteria is resistant will not be effective. Even more, a major factor in the rise of antibiotic resistant bacteria is the use of antibiotics without consideration of resistance issues. *See id.* § 190.12 ("Isolates

deemed significant may be subjected to additional identification and susceptibility procedures as requested by the ordering physician.").

114. Susceptibility testing is billed using CPT Code 87186, for which Medicare paid $8.65 in 2022. This code may be billed multiple times if multiple strains of bacteria are tested for antibiotic susceptibility.

115. Including the initial culture and (if necessary) a second day of incubation and susceptibility testing, a standard BUC takes 24 to 72 hours to produce results.

## ALLEGATIONS

### Defendant Thermo Fisher and Pathnostics Co-Market "Research Use Only" Technology to Commercial Diagnostic Laboratories and Clinicians

116. Thermo Fisher is a publicly traded (NYSE: TMO) Fortune 500 company that was formed through the 2006 merger of Thermo Electron and Fisher Scientific.

117. Thermo Fisher is an international developer, manufacturer, and supplier of scientific instrumentation, analytical instruments, reagents and consumables, software, and provides services for research, analysis, discovery and diagnostics.

118. Thermo Fisher markets its products through direct sales force of professionals, catalogs, and e-commerce. The company operates its business through three segments: Analytical Technologies, Specialty Diagnostics, and Laboratory Products and Services.

119. Among Thermo Fisher's products is a "Real-Time PCR Solution for Urinary Tract Microbiota (UTM) Detection" (the "Solution"). Thermo Fisher prominently promotes the Solution on its website and advertises products which use the Solution's technology for sale.

120. Cap Diagnostics, LLC is a California-based company founded in 2011. It is currently doing business as Pathnostics.

121. Using Thermo Fisher's Solution technology, Pathnostics developed and marketed Guidance, a test that "utilizes proprietary technology featuring combined phenotypic sensitivity and genotype" in order to test for UTIs. Although the test has not been approved by the FDA, Guidance has been responsible for Pathnostics' rapid growth over the past several years.

122. Similarly, each of the Defendant Diagnostic Labs developed and marketed UTI tests using Solution technology.

123. Each Thermo Fisher web page advertising and promoting the Solution includes (in very small print at the bottom of the page) the disclaimer "For Research Use Only. Not for use in diagnostic procedures." Yet Thermo Fisher's marketing, including on its website, plainly and openly targets commercial diagnostic laboratories and clinical physicians who order UTI diagnostic tests from them.

124. Thermo Fisher's marketing message for the Solution touts its "speed and accuracy in UTM pathogen detection." Thermo Fisher claims that the Solution enables UTM detection "in under five hours" and negatively contrasts the "long time" it takes for traditional culture-based tests to produce results. However, the contrasting claims vary: on one page, it claims that "[c]urrent culture plating methods can typically take anywhere from 18 to 30 hours – even longer with subsequent antimicrobial sensitivity analysis"; in a linked marketing webinar, 48 to 72 hours is claimed.

125. Thermo Fisher does not explain why scientific researchers would need or benefit from faster test results. However, it expressly describes how commercial diagnostic labs benefit – and profit – from faster results: "Our new real-time PCR solution enables rapid urinary tract microbiota (UTM) detection in under five hours—allowing for flexible content and optimized for

multiple throughputs at a low cost per sample. This is the first commercially available molecular solution for UTM pathogen detection that labs can implement themselves."

126. That Thermo Fisher is marketing to commercial diagnostic labs, and not research labs, is further demonstrated by its stressing "high throughput" – *i.e.*, that the Solution enables labs to process and get results from hundreds of samples per day: "**Scalable solution with high throughput option available** —using OpenArray™ nanofluidic technology, capable of processing up to 600 samples per day on a single instrument* *Based on three instrument runs in a single 8 hour shift per day in a laboratory. Can increase to 800+ samples per day running workflows immediately after one another across multiple shifts in a day."

127. Thermo Fisher also offers products using the Solution for sale. Customers can fill out an online form to get price quotes, request more information, and/or have a sales representative contact them. The website also enables customers to order products directly from Thermo Fisher. For example, customers can order a UTI testing panel (trademarked as the TaqMan OpenArray Urinary Tract Microbiota Comprehensive Plate). The listed price is $924.00 per unit, but customers who register on the website evidently can negotiate lower prices.

128. Thermo Fisher's website links potential customers to a webinar featuring David Baunoch, CEO and President of Pathnostics, a diagnostics solutions company, and Jorge Fonseca, Product Director of Genetic Testing Solutions for Thermo Fisher. The webinar was hosted by Dark Intelligence Group, a market-intelligence firm "serving clinical labs and pathology groups" which publishes DarkDaily, an online trade news report.

129. The webinar touted Pathnostics' Guidance UTI Diagnostic Solution, a diagnostic testing regime developed using Thermo Fisher's Solution. Both presenters demonstrated that the webinar, like the rest of Thermo Fisher's marketing, was focused on selling the Solution to

commercial diagnostic labs and convincing practicing clinicians to order Solution-based tests rather than traditional (and much cheaper) culture tests. Virtually nothing in the webinar addressed using the Solution for scientific research.

130. Baunoch's presentation discussed how the Solution enables clinicians to improve patient outcomes. He discussed the costs to the U.S. healthcare system resulting from improperly diagnosed and treated UTI infections, including the growing incidence of infections by organisms which are resistant to antibiotics. Baunoch blamed these problems on physician's reliance on traditional culture testing and treatment of UTIs based on symptom-driven diagnoses rather than test results, which he dubbed "rinse and repeat." He said culture tests are "biased" to detect E. Coli bacteria, are "unable" to detect slower-growing organisms and are subject to contamination resulting in misdiagnoses and chronic or repeat infections.

131. Baunoch described the purportedly superior results obtained with tests based on the Solution's technology. He listed a large number of infectious organisms (including viruses and fungi) causing UTI that the tests can detect. He cited research concluding that a "significant number" of UTIs are polymicrobial, i.e., caused by more than one infectious organism, and that traditional culture tests and treatment are less efficacious in curing such UTIs.

132. Although Fonseca works for Thermo Fisher and not Pathnostics, his presentation focused on Pathnostics' diagnostic testing products and services. He repeatedly referred to the webinars' presumed audience expressly as "commercial labs" and "labs such as yours," ultimately urging them to "partner with Thermo Fisher."

133. The Q&A period of the webinar also illustrated that Thermo Fisher's target market is commercial labs. Baunoch was asked how the tests are billed to healthcare insurance programs (again, not an issue for scientific research labs – indeed, investigational or experimental services

are generally not reimbursable). He answered that code "stacks" are used to get reimbursement. He added that Thermo Fisher has "played a leading role" in advocating for changes in how tests are reimbursed, including mustering study data for that purpose.

**<u>Thermo Fisher and the Diagnostic Labs Use the Solution to Exploit Government Healthcare Programs</u>**

134. Thermo Fisher and the Diagnostic Labs use proprietary UTI tests, which rely on the Solution's technology, to exploit Government healthcare programs. The Diagnostic Labs' broad testing panels are designed to cause physicians to order more testing than medically necessary. The order forms designed by Thermo Fisher and the Diagnostic Labs do not allow doctors to select or customize individual tests. Each "basic" test, for example, evaluates from approximately 15 to 27 organisms, including fastidious bacteria and yeast infections.

135. The Solution-based UTI tests cost Medicare between $700 and $800 for each test, which is between 70 and 100 times more expensive than the $8 to $11 Medicare pays for a standard urine culture which identifies the presence and number of bacteria in a urine specimen.

136. Thermo Fisher and Pathnostics have thus created a pretext to bill healthcare insurers (both public and private) for many multiples of the number of tests that are clinically appropriate, and thus reap the profits from reimbursements far exceeding the amounts insurers pay for traditional (and in nearly all cases, clinically sufficient) culture tests.

137. Thermo Fisher and the Diagnostic Labs brag that Solution-based Guidance tests almost three times more pathogens—up to 45 in all—than its competitors. For example, a Pathnostics marketing brochure touts:

## KNOW HOW TO SUCCESSFULLY TREAT



**Genotype resistance**
**+**
**Antibiotic sensitivity**

- Tests more antibiotics
- Leverages dual assessments
- **Uncovers more effective, personalized therapy options**

**The difference is clear**

| | GUIDANCE | OTHERS |
|---|---|---|
| Pathogens Tested | **45** | ≤16 |
| Antibiotic Resistance Genes | **38** | ≤27 |
| Pooled Phenotypic Sensitivity | **YES** | NO |

138. Pathnostics' marketing materials claim that its Guidance tests "provide a better way to test and treat chronic urologic infections. Guidance is a unique rapid molecular test for both pathogen identification and antibiotic sensitivity . . ." Pathnostics tells its physician-customers that its tests are not meant to be prescriptive for patients. Yet, Sales Director Cory Lance and President Kip Vernaglia tell potential customers that Guidance is not a screening test, even though its marketing materials explain that "Guidance Points The Way." Pathnostics adds that it is the "physician's prerogative" to determine when and how to treat a patient based on "clinical symptoms and the presence of bacteria, virus or yeast in the urine."

139. Pathnostics tells prospective customers that its "therapeutic options" showcases antibiotic sensitivity for the polymicrobial environment and provides "personalized antibiotic

options based on supportive evidence." The Guidance test reports warn physicians about using these "therapeutic options." The reports say:

> Supportive evidence indicates situations for which antibiotic use (either FDA-approved or off label) is illustrated in peer reviewed literature. Treatment options are not intended to be prescriptive for this patient. Appropriate medical judgment should be exercised by the attending physician before prescribing for this patient. Moreover, changes in research studies may occur. Although we attempt to update the report with new data promptly, we cannot prevent delays.

140. Pathnostics adds a second disclaimer at the bottom of every report:

> This test was developed and its performance characteristics determined by Pathnostics. It has not been cleared or approved by the U.S. Food and Drug Administration. The FDA has determined that such clearance or approvals is not necessary . . . This laboratory is certified under the Clinical Laboratory Improvement Amendments of 1986 (CLIA-86) as qualified to perform high complexity clinical testing . . ."

141. Similarly, Defendant Genetworx (which admittedly uses the Thermo Fisher Solution for its UTI PCR testing) touts the broad array of pathogens which its tests can detect with fast results:

## The PCR Testing **Advantage**

### Detection

GENETWORx can detect more than 30 different types of pathogens and deliver 99% accurate results within 24-48 hours of lab sample receipt.

### Accuracy

GENETWORx molecular pathogen testing is more accurate than standard culture testing. Our molecular pathogen testing detects anaerobic organisms growing deep inside that standard cultures often miss. [4]

### Amplification

Using a molecular approach, amplification of testing sample genetic material is faster than standard culture growth and delivers increased sensitivity and a quicker result. [5]

### Speed

Our rapid turnaround time is within 24-28 hours from laboratory receipt.

### Simplicity

Our simple to read report gives clinicians quick, actionable intelligence to make better treatment decisions.

### Identification

Ability to identify pathogens when the patient is on empiric antibiotic treatment.

142. The standard urine culture for diagnosing uropathogens has basically remained unchanged since the 1950s, with clinicians focusing on the cutoff thresholds used to identify and treat infections. Indeed, physicians have traditionally put patients presenting with UTI symptoms on antibiotics even before getting test results. However, research has shown that neither UTI symptoms nor even the detected presence of an infective organism should prompt antibiotic treatment. As Thermo Fisher and Pathnostics have stressed in their marketing messages, these traditional treatment methods have purportedly aggravated the increased incidence of antibiotic-resistant organisms and chronic infections which are harder to treat and cure.

143. Thermo Fisher and Pathnostics purported to offer a solution when they introduced the Solution and the Guidance test. Pathnostics claimed that Guidance more precisely identified

uropathogens in urine samples. The Solution employs Polymerase Chain Reaction analysis ("PCR"), a technique that amplifies DNA and compares the same to a control in order to identify an infection. It also purports to measure the pathogens' antibiotic sensitivities to identify the most targeted and effective therapies.

144. Unpublished clinical studies explain that PCR produces a test result more quickly and can be useful in detecting difficult-to-culture pathogens, low levels of bacteria, or non-bacterial pathogens in specimens. Essentially, the PCR component identifies more pathogens than do culture tests, and pooled sensitivity testing measures pathogens' resistance to antibiotics.

145. A Pathnostics brochure states: "PCR may provide greater accuracy and speed over urine culture for identification of pathogens and may significantly improve patient care for cystits (inflammation of the bladder)." It continues: "PCR is non-inferior to traditional urine culture for detection and identification of bacteria in patients with clinical symptoms of UTI."

146. Complex laboratory tests developed in-house (LDTs or "home brew" tests) are regulated by the FDA and CLIA, through CMS. The FDA generally has not enforced pre-market review and other applicable FDA requirements because LDTs were relatively simple lab tests generally available on a limited basis. With advances in technology, these home-brewed tests have evolved and proliferated since the FDA received authority to regulate them as medical devices in 1976. Some of these tests now are more complex and present risks. Though it has not changed its policy, the FDA has acknowledged that these home-brewed tests are more prevalent and widely-used.

147. The FDA "has identified problems with several high-risk LDTs, including: claims that they are not adequately supported with evidence; lack of appropriate controls yielding erroneous results; and falsification of data." *Laboratory Developed Tests*, FDA Publication

(available at fda.gov) The FDA has warned that patients and providers cannot uniformly rely on all tests offered for clinical use as some are not subject to premarket oversight to ensure they provide accurate measurements and valid claims. *Discussion Paper on Laboratory Developed Tests (LDTs)*, FDA Publication, Jan. 13, 2017 (available at fda.gov).

148. Many of those who called for FDA oversight "were concerned that many LDTs are being marketed without any independent review of clinical validity, *potentially harming patients and wasting health care dollars*." Id. at 3 (emphasis added). Accordingly, the FDA proposed agency oversight where:

- The LDT is *not analytically and clinically valid* or there is an absence of sufficient data to support its analytical and clinical validity;
- The manufacturer of an LDT has *engaged in deceptive promotion*; or
- There is a reasonable probability that the LDT *will cause death or serious adverse health consequence*s.

*Id.* at 4 (emphases added).

149. The Thermo Fisher and Diagnostic Labs' technologies and tests have not been approved or cleared by the FDA. Tests used by commercial clinical laboratories are regulated by CMS through CLIA. CMS, however, only evaluates a test's performance characteristics. It determines if a specific test finds what it is designed to find. The CLIA program does not address the clinical validity of any test. CMS defines clinical validity as the accuracy with which a test identifies, measures, or predicts the presence or absence of a clinical condition or predisposition in a patient.

150. Many laboratory-developed tests that have not been examined or approved by FDA require premarket review by the New York State Department of Health Clinical Laboratory Evaluation program. The program evaluates these home-brewed tests when they are performed in, or the sample has been taken from, New York State. Over the last decade, it has examined more

than 11,000 of these new and modified tests to assure doctors and patients the results they receive are analytically and clinically valid.

151. Pathnostics is well acquainted with the New York program. A database of LDT tests approved by New York State reports six tests developed by the company have been evaluated. None of the approved tests include Guidance, even though the company claims it is used nationwide.

152. FDA derives its authority to regulate these tests from the Medical Device Amendments Act, which includes laboratory-developed diagnostic tests in its definition of "medical devices." Medical devices, in turn, are considered "experimental" if the absolute risk of the device type has not been established (that is, initial questions of safety and effectiveness have not been resolved) and the FDA is unsure whether the device type can be safe and effective. As described, the FDA, through its own public statements, has acknowledged it does not test these complex LTDs and that patient harm may result. As the agency is unsure of the safety and efficacy of these tests, they are by definition experimental. Medicare is prohibited by law for paying for experimental or investigational devices, and thus experimental or investigational diagnostic tests.

153. Still, the use of these tests, particularly those involving genetics or DNA, are growing rapidly as investors are pumping millions and even billions of dollars into corporations that are developing procedures designed to enable personalized medicine, creating a genomics industry estimated at nearly $30 billion in 2021, and projected to reach nearly $100 billion by 2028. *Genomics Market Size, Share & COVID-19 Impact* Analysis, Fortune Business Insights, January 2022 (report included Thermo Fisher among list of key companies profiled). Critics say many of these tests have not improved patient care and Medicare should not pay for them until they are scientifically validated and are proven clinically useful.

154. The FDA acknowledges that clinical validity – especially of well-established tests – can often be supported by studies, scientific literature, well-curated databases and other appropriate sources provided they are conducted with rigor and meet scientific evidence standards. Few studies have compared PCR tests with urine cultures. Thermo Fisher and the Diagnostic Labs market their products based on internal studies that have not been evaluated by an independent third party or a peer reviewed publication.

155. For example, Pathnostics sponsored a study which was conducted by Larry T. Sirls. Dr. Sirls is part of Comprehensive Urology, a division of Michigan Healthcare Professionals—a member of a group that contracts with Pathnostics. No independent or peer-reviewed studies of Guidance have been published.

156. Despite what their marketing touts, neither Thermo Fisher's Solution nor the Diagnostic Labs' UTI tests are reasonable or necessary, as (1) there is no independent clinical documentation to support the accuracy or validity of the tests; and (2) they cannot be relied upon to treat patients.

157. Thermo Fisher executives privately acknowledge the serious flaws and shortcomings in its Solution technology and Solution-derived products that cause variations and inaccuracies in test results. On or about February 2, 2022, a representative of Relator had a discussion with Manoj Gandi, M.D., Ph.D., Thermo Fisher's Chief Medical Officer, and Nitin Puri, Ph.D., its Director of Clinical Product Management. Among other things, Drs. Gandi and Puri admitted that

a. Sample collection is dependent on the collection device and the nutrients used to preserve and enhance the growth of organisms in a urine culture;

b. The sample collection kits are manufactured by different companies. use different methodologies, and collect different sample sizes;

c. Results can vary depending on whether a diagnostic lab uses an array or a sample plate and the amount of extracted sample, and whether they put too little sample on the array or plate;

d. Cutoffs are based on validation standards and can vary. While 36 to 37 cycles are recommended based on the organism, this may also depend on the diagnostic instrument being used, which itself can create variables; and

e. The definition of a positive result based on the critical-threshold cutoff can be based on a biological replicate versus a technical replicate. The threshold for a positive result can vary among labs. While triplicate is best, some labs only use a duplicate method.

158. Knowledgeable personnel at the Diagnostic Labs readily acknowledge the grave deficiencies in UTI tests utilizing the Solution or similar PCR technology. Anami Patel, Ph.D., Chief Science Officer at Poplar Healthcare/Bostwick, admitted to a representative of Relator that there are no data or literature supporting extrapolating genetic test results to results obtained from culture tests (measured in colony-forming units per milliliter or CFU/ml). Indeed, when Bostwick set up the PCR testing lab, personnel realized that 30-40% of samples from symptomatic patients resulted in negative PCR tests, even though the PCR panel purportedly tested for 17 organisms. For that reason, Dr. Patel explained that Bostwick does culture tests simultaneously with PCR tests as a control.

159. Dr. Patel also acknowledged the profit motive in PCR testing. While he believed that Bostwick charged $200.00 per test, he knew that other labs charged up to $800.00 per test, and that physicians were running PCR tests in their own labs to reap the substantial profit. He noted that at Bostwick, he reported to commercial sales managers, not to physicians.

160. As part of its investigation, Relator sent urine specimens from two Medicare-covered patients, each collected at the same time, to eleven different Diagnostic Labs that used the Solution UTI tests. As a control, Relator sent the urine specimens to Quest for testing using the traditional culture method.

161. For the first patient, only three labs detected any pathogens. Specifically, those labs detected E. coli, the most common pathogen causing UTIs (and one easily grown in the traditional culture test). However, the Quest culture test was negative.

162. Two of the same three labs detected E. coli in the second patient's urine sample, but the third detected no pathogens whatsoever. However, of the other eight labs, seven detected various other pathogens, and one detected none. The Quest results were reported growth of mixed flora.

163. These results demonstrate that Solution-based UTI tests provides such varying and inaccurate results as to be unreliable, clinically useless and potentially harmful,

164. Similarly, when urine specimens are tested using both the Guidance test and the gold standard urine culture, they rarely agree. The Guidance test produces false results, frequently identifying organisms that are not clinically significant. These false positives lead providers to over-prescribe antibiotics, causing potential harm to both individual patients and to the general public, as overutilization of antibiotics encourages the development of resistant strains of infectious microbes.

165. Relator compared test results from Pathnostics with those from laboratories using standard urine cultures, as the basis for their evaluation for 23 Medicare patients. Pathnostics states in its marketing materials that typical urine cultures miss up to two-thirds of all UTI-positive

patients. However, that assertion was not borne out by the dual testing of Relator's 23 Medicare patients:

- In one case, the standard urine culture found low levels of a pathogen while Pathnostics' test did not;
- In almost 40% of the cases—12 of 29—the two methods posted similar results; in three cases, both found no pathogens; in five instances, both found similar amounts of E. Coli—the most common pathogen in a UTI—though Pathnostics reported additional organisms; and, in another three, both found organisms at extremely low levels;
- The remaining tests varied widely—in ten cases, the urine culture uncovered multiple or mixed urogenital flora at varying levels, while Pathnostics named multiple organisms; in seven more, Pathnostics detected as many as five organisms, some at high levels and involving E. Coli, while the urine culture reported no growth.

166. Comparison tests of 17 of 20 privately insured patients offer similar discrepant results between the gold standard urine culture and the Guidance test:

- In one case, the urine culture method found high levels of a pathogen while Pathnostics reported low levels of a different organism;
- In two cases, the two testing methods reported different pathogens;
- Both testing methods reported more than 40 percent of the samples—7 of 17—contained no pathogens at all or reported the same levels of E. Coli, although Pathnostics found varying levels of additional organisms;

- In five instances, the urine culture method found no organisms, while Pathnostics reported multiple pathogens, some at high levels; and

- In two instances, Pathnostics found up to five pathogens, some at high levels, while the urine culture reporting method reported only low levels of multiple organisms.

167. These variations in test results raise questions about the accuracy and the usefulness of the Guidance tests in clinical practice, particularly as they have not been independently evaluated. Created by Pathnostics in its own laboratory using Thermo Fisher's Solution, neither the tests nor the methodology have been examined by the FDA nor approved by taxpayer-backed health programs. At present, no independent, peer-reviewed published studies exist evaluating the efficacy of these tests, dubbed "home brewed" by some and experimental by others.

168. UTIs are among the most prevalent infections in the country. Inaccuracies in testing could lead to under- or over-prescribing and lead to severe patient harm. More importantly, the overuse and over-prescribing of antibiotics can cause antibiotic resistance. Antibiotic resistance is a public health problem that leads to longer hospital stays, higher medical costs, and increased morbidity and mortality.

169. Conventional labs testing urine cultures report some groups of pathogens, particularly those at low levels, as either multiple organisms or mixed urogenital flora. The unproven Pathnostics tests for these same samples produce results naming individual organisms, often at higher levels, than confirmed by standard urine cultures.

170. For example, the standard urine culture test for J.B., a 79-year-old female Medicare beneficiary, found multiple organisms, each less than 10,000 colony forming units, noting that

"these organisms, commonly found on external and internal genitalia, are considered to be colonizers." For the same patient, Pathnostics reported high levels, more than 100,000 cells per milliliter of E. Coli, as well as Enterococcus faecalis and Kleibsiella pneumoniae, both at more than 100,000 cells per milliliter.

171. Pathnostics' home-brewed technique often produces organism counts as much as ten times higher than the number of colony-forming units identified by the standard urine culture method. For example, Pathnostics supplied the following test results:

- S.S., a 78-year-old female Medicare beneficiary: Guidance identified three organisms—two with counts of 100,000 cells per milliliter—levels between four and ten times greater than the mixed urogenital flora identified by the conventional urine culture;

- D.D., a 49-year-old privately insured woman: Guidance identified two organisms, one with counts of 100,000 cells per milliliter; the conventional urine culture reported three or more organisms present, each with more than 10,000 colony-forming units per milliliter; it added the results may represent normal flora contamination from external genitalia;

- J.H, a 42-year-old privately insured woman: Guidance reported more than 100,000 cells per milliliter of Strep Viridians Group Strep, a group of Streptococcus organisms; the conventional method identified Enterococcus faecalis, a gram positive bacterium, at levels 10 times lower than Pathnostics;

- B.C., a 70-year-old female Medicare beneficiary: Guidance reported Coagulase Negative Staph at 10,000 to 49,000 cells per milliliter as well as a second

organism, Corynebacterium riegelii, at levels of less than 10,000 cells per milliliter; the conventional urine test did not detect any colony growth;

- B.D., a 77-year-old female Medicare beneficiary: Guidance showed one organism, Coagulase Negative Staph at 10,000 to 49,000 cells per milliliter, and a second organism, Actinotignum schaalii, at levels of less than 10,000 cells per milliliter; the conventional urine culture did not detect any colony growth.

172. Guidance test results thus appear to report inflated counts of the numbers of organisms, and/or potentially false positive diagnoses. Such results lead to patient harm due to the risks of drug interactions, allergy, and unnecessary treatments.

173. Experts, scientific publications and news reports conclude that many doctors seem unable or unwilling to overlook positive test results, even in asymptomatic patients. Physicians respond by prescribing full courses of powerful antibiotics. Antibiotic overuse contributes to drug resistance, as infectious bacteria adapt and the drugs lose effectiveness. Resistant bacteria cause chronic and severe infections, which lead doctors to prescribe even more toxic and costlier treatments. Antibiotics also have serious and sometimes dangerous side effects and interact negatively with widely-used medications often taken by older adults. Infections from antibiotic-resistant bacteria are frequently serious, are and contribute to increased morbidity and mortality especially in older patients.

**<u>Billing for Thermo Fisher-Derived Tests</u>**

174. Medicare requires physicians to designate a diagnosis code when requesting a lab test. The code, currently known as an ICD-10 code, is supposed to provide the patients diagnosis. While doctors order tests, laboratories that submit claims to Government Payors for reimbursement have an obligation to determine whether the requested test is reasonable and necessary.

175. On occasion, the lab—not the doctor who ordered the test—actually submits the claims and receives reimbursement for services performed. In that case, the lab must certify the medical necessity for the service. The CMS claim form—CMS-1500—requires labs to certify that the services were medically indicated and necessary for the health of the patient.

176. The Diagnostic Labs bill Government Payors (and private insurers) using one of eight CPT codes for its Solution-based UTI tests. Claims data maintained by CMS for 2016 and 2017 show CPT 87798 as the most common code reimbursed to the Diagnostic Labs. CPT 87798 is described as "infection agent detection by nucleic acid (DNA or RNA), not other specified, amplified probe technique, each organism."

177. In 2016, the Diagnostic Labs submitted this "other" code (CPT 87798) as the reason for payment nearly three times more often than any other lab. By 2017, Pathnostics submitted lab tests using CPT 87798 more than any other lab in the country, including the three laboratories that account for more than 90 percent of all lab tests in the United States—Laboratory Corporation of America, Quest Diagnostics, and BioReference Laboratories.

**The Diagnostic Labs' Kickback and Markup Schemes**

178. All of the Diagnostic Labs billed Government Payors (and private insurers) for medically unnecessary UTI PCR tests.

179. Further, in providing medically unnecessary UTI PCR tests, many of the Diagnostic Labs engaged in unlawful kickback and markup schemes with referring physicians and practice groups.

180. On information and belief (and as specifically alleged herein), the Diagnostic Labs entered into arrangements or agreements with physicians and practice groups, usually by written contracts, which established fixed prices for particular diagnostic tests (including results). These

agreements (many of which misleadingly describe the physician or practice group as the "Referring Lab") thus enabled physicians to submit reimbursement claims to Government programs and private healthcare insurers at much higher rates, thus reaping significant profits.

181. Although the written agreements generally contained representations and/or disclaimers stating that the arrangements were not meant to induce or reward patient referrals, and that they were fully compliant with applicable laws and regulations, their actual operation was intentionally and knowingly unlawful.

182. The unlawful intent and operation of these agreements was often articulated in the Diagnostic Labs' sales "pitches" to physicians and practice groups and/or illustrated in marketing materials.

183. For example, on or about April 21, 2022, Relator's representatives had a telephone call with Jarrod Rudo, marketing director for Defendant Real Diagnostics to discuss a potential agreement between Relator and Real Diagnostics.

184. Rudo informed Relator that Real Diagnostics had over 1,000 accounts, many of which used them for UTI and other molecular testing.

185. Rudo offered Relator three options: (1) Real Diagnostics would perform Relator's tests and charge Relator $225 per test, and Relator would bill Government programs and/or private insurance; (2) Real Diagnostics would submit all reimbursement claims but would waive all patient co-pays and deductibles; or (3) Real Diagnostics would bill Government programs and Relator would bill private insurance, and Real Diagnostics would charge Relator $225 per test. He explained that the average Medicare reimbursement for Real Diagnostics' tests was about $500, but because they would charge only $225 per specimen, Relator would profit by approximately $275 per test referred.

186. Real Diagnostics then sent a proposed written agreement to Relator reflecting the first option that Rudo had discussed.

187. On or about May 28, 2021, Relator's representative had a conversation with two representatives of Defendant Molecular Testing Labs: Dan Samia, Director of Business Development, and Jack Wallace, Inside Sales Rep. Among other things, Samia stated that the lab uses Thermo Fisher technology (QuantStudio5) for their genetic testing. He admitted that most Government programs and private insurers will deny reimbursement for these tests, but explained that the lab had billing experts who worked with providers and provided documentation and information to get reimbursement.

188. Samia further stated that the lab charges about $200 per test, but that Medicare reimburses between $550 and $700 per test. He explained that the lab works with Thermo Fisher to set up labs at practice groups (including hiring and training lab technologists and directors) and provide discounted pricing for equipment (since it is purchased through Thermo Fisher).

189. Defendant Molecular Testing Labs sent Relator a proposed agreement pursuant to which the lab would charge Relator $150 per test. Although it included the usual language disclaiming that the proposed arrangement would violate any laws, the agreement contained no provisions addressing the parties' respective responsibilities for billing.

190. Defendant Molecular Testing Labs also sent Relator a proposed agreement whereby it would set up a diagnostic lab as Samia had described it.

191. On or about October 21, 2021, Defendant Molecular Testing Labs billed Medicare $912.34 for a "detection test by nucleic acid for organism, amplified probe technique." That claim was denied.

192. On or about May 28, 2021, Relator's representative had a conversation with Brad Cleaver, a Senior Account Manager at Defendant Genetworx. He stated that Genetworx uses Thermo Fisher technology for its diagnostic testing. He admitted that Genetworx will bill patients a maximum of $199 out of pocket, it never collects copays or unreimbursed/denied test costs from patients, and in fact it has no collections department. He noted that Medicare reimbursement is approximately $300 per test. He further admitted that Genetworx engages in "revenue sharing" with other labs, hospitals and physicians/practice groups to "keep revenue in house."

193. Defendant Genetworx LLC offered Relator a UTI Pathogen Panel for $300 per test and other UTI panels for $155 per test. Its proposed agreement specified that the Diagnostic Lab would not bill any Government healthcare programs and would not bill any private insurers if Relator give it advance notice that Relator would bill such insurers.

194. Defendant Solaris Labs offered UTI tests to Relator for the price of $249. Notably, Solaris Labs' "New Client Registration Form" requests a potential referrer to estimate its "weekly supply usage" by number of samples, another way of having the prospective customer communicate its proposed volume of referrals.

195. Defendant Precision Life Sciences, LLC offered Relator a Molecular UTI test for $125 per test for patients covered by the "Medicare Part A program or any other program that incorporates laboratory testing into the amounts paid to Client." Its proposed agreement specified that for such patients, Relator would bill for such tests and pay the Diagnostic Lab the fixed fee. For patients covered by the "Medicare Part B program or other third-party payor program that does not bundle laboratory testing into the amounts paid to Client," the Diagnostic Lab would bill for such tests.

196. Defendant MHS Labs offered Relator a Urinary Tract PCR Infectious Disease Pathogen Panel for $275. The MHS Labs agreement contains no provision concerning billing responsibilities, but "Client Bill" is checked off in the "Services" document appended as Exhibit A.

197. Defendant ISPM Labs LLC d/b/a Capstone Healthcare offered Relator "Optimized UTI" testing which promised to "deliver[] a snapshot of a patient's urinary tract micro-environment covering 21 organisms" and would also "define[] the genes associated with antibiotic resistance."

198. On or about October 21, 2021, Defendant ISPM Labs LLC billed Medicare $420.00 for a "detection test by nucleic acid for multiple organisms, amplified probe(s) technique." That claim was denied.

199. On or about October 21, 2021, Defendant ISPM Labs LLC billed Medicare $910.00 for a "detection test by nucleic acid for organism, amplified probe technique." That claim was denied.

200. On or about October 21, 2021, Defendant AIT Laboratories billed Medicare $438.60 for a "detection test by nucleic acid for organism, amplified probe technique." That claim was denied.

201. Defendant Med Health Services Labs offered Relator a Urinary Tract PCR Infectious Disease Pathogen Panel for $275.00 per test.

202. Defendant ACCU Reference Medical Lab offered Relator a UTI test for $170.00 per test. The proposed agreement stated that it applied to "cash-only patients . . . and those patients covered by those third party payors that permit the testing and billing arrangement set forth

herein[.]" The agreement stated that ACCU would directly bill any third-party payors which "do[] not permit the testing and billing arrangement set for [*sic*] herein[.]"

203. On or about October 21, 2021, Defendant ACCU Reference Medical Lab billed Medicare $1,637.50 for a "detection test by nucleic acid for organism, amplified probe technique." That claim was denied.

204. Defendant Health Care Providers Laboratory offered to sell Relator a Molecular UTI test and advised Relator that Medicare reimbursement was between $195.00 and $275.00 per test. The UTI tests for 26 bacteria, six viruses and three yeasts. Some physicians gave Health Care Providers Laboratory standing orders and some ordered tests on an as-needed basis.

205. Defendant Genesis Reference Laboratories offered Relator a Full Panel UTI test for $200.00 per test. The Genesis agreement also offered less-expensive, more narrowly-focused UTI tests, but the Genesis sales rep discouraged those options, explaining that "most offices and providers will still want to have a full panel for clinical reasons on the big picture of whats [*sic*] going on[.]"

206. The Genesis agreement provided that Genesis would bill third-party insurance providers if Relator "ordered and delivered [tests] with accurate coverage information," and that it would bill Relator if that information were not provided.

207. Defendant MedArbor Diagnostics offered Relator a Comprehensive Panel UTI test for $250.00 per test, and a UTI ID Panel for $200.00 per test. The MedArbor agreement contemplated that Relator "owns and operates a CLIA-certified clinical laboratory" and that MedArbor would provide "certain reference Laboratory services, which Laboratory is unable or does not have the capacity to perform in its own Laboratory." The agreement also provided that MedArbor could in turn send Relator's samples to other laboratories for testing. The agreement

further provided that Relator would "be solely responsible for billing or designating the proper billing entity for [MedArbor's] Services" and that "MedArbor shall not be permitted to bill any patient or third-party payor for any of the Reference Laboratory Services it provides under this Agreement."

208. On or about October 21, 2021, Defendant MedArbor billed Medicare $507.00 for a "detection test by nucleic acid for organism, amplified probe technique." That claim was denied.

209. Defendant Helix BioLab offered Relator a UTI qPCR panel assay for $235.00 per test. Helix's proposed agreement was based on Relator's submitting at least 20 samples per month for testing. It contained no provisions concerning the parties' respective responsibilities for billing third-party payors.

**Thermo Fisher Supports the Diagnostic Labs' Kickback Scheme**

210. In addition to submitting claims to Government Payors and private healthcare insurers for medically unnecessary, experimental and unreasonable UTI tests, the Diagnostic Labs engage in improper fee-splitting and financial arrangements with physicians, in violation of the Stark Law, the Anti-Kickback Statute, and the Anti-Markup Rule.

211. Some of the Diagnostic Labs pay physician groups a percentage of the revenue they receive for UTI tests directed to the lab.

212. In the case of Pathnostics, the physician practice is required to provide Pathnostics with at least 500 specimens per month in order to be compensated. The physician practice and Pathnostics then split the fee—57% to the lab and 43% to the practice. Pathnostics settled on those fee-splitting percentages after negotiating a "gentleman's agreement" with its first physician practice partner.

213. Pathnostics currently has fee-splitting arrangements with seven large physician groups. Those groups include:

- Golden Gate Urology (San Francisco-based urology group with 10 locations; this 20-member medical group now uses Guidance exclusively for testing government-insured patients)
- TUA Tennessee Urology (Knoxville-based urology group with 11 locations)
- Austin Urology (Austin-based urology group with 20 locations)
- Michigan Healthcare Professionals (Michigan group with two large laboratories and approximately 400 physicians)
- Pathnostics East (a lab set up by Dr. Kirk Wojno, the laboratory director for Michigan Healthcare Professionals); Pathnostics East is made up of 50 urologists, who now rely exclusively on the Guidance test as opposed to traditional urine cultures.

214. Pathnostics' sales pitch to physicians, titled "Now Is Your Time To Enhance Your Revenue," describes generating substantial additional revenue and uses phrases such as "Tired of Working Harder, Earning Less?" and "With Pathnostics, Get Reimbursed For Tests You Are Currently Performing But Not Getting Paid For." It also states, "The Specimens You Send Pathnostics Will Generate Substantial Monthly Revenue To Your Medical Practice Using the TC/PC Model."

215. In June 2019, Kip Vernaglia, the president of Pathnostics, met with Relator's principal and other staff members to discuss setting up a partnership arrangement with Relator. Vernaglia told Relator's principal and staff that Relator would receive, on average, 55 percent of

the net of the dollars generated through Guidance testing. The contract spelled out the compensation to be paid by Relator to Pathnostics: monthly fees for technical staff and management support services; $7,000 per month for use of the equipment; $155 for each molecular assay performed (leaving $545 for the practice); and an 8% fee for the right to use the proprietary assay system. At $700 per test with a 500-test minimum, the contract had the potential to generate at least $4.2 million.

216. Pursuant to HHS-OIG guidance as described, laboratories may not use unreasonably large "panels" of tests, standing orders and other misleading paperwork to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.

217. To sell more panels, Thermo Fisher also encourages and instructs diagnostic labs to routinely use improper billing code modifiers to get fraudulently-inflated claims paid.

218. Finally, Thermo Fisher also causes the submission of false claims by assisting physicians and other providers bill for services performed by the physicians and laboratories in spite of federal and state prohibitions on such pass-through billing.

219. Thermo Fisher personnel offered Relator kickbacks to order tests in the form of free services, free testing supplies and other inducements.

220. Thermo Fisher personnel also coached Relator on how to bill Medicare, Medicaid and other government-funded and commercial insurers for the clinical laboratory tests and offered to assist Relator in billing for these tests directly in violation of Medicare rules.

221. Relator learned of Thermo Fisher's fraudulent scheme first-hand through its interactions with Thermo Fisher personnel, as those personnel attempted to induce Relator into purchasing a UTM testing panel.

222. Thermo Fisher offers as a free service, "Analytical Validation Consulting Services," designed to work with commercial diagnostic labs in order to accelerate and streamline their claim validation process by providing technical project management of labs' analytical validation.

223. Thermo Fisher's website describes these illegal free services:

> **Save Time**—Get personalized consultation to help accelerate your launch up to 75% faster than the average AV, enabling laboratories to get into routine testing faster and accelerate the return on investment.
>
> **Cut Costs**—Help reduce costs and provide transparency of your end-to-end investment with up to 50% less financial impact than the average AV.
>
> **Maintain Compliance**—Receive proper documentation templates that facilitate your lab compliance. Our experienced consulting team will assist in designing a proper sample run strategy to establish test performance metrics.

224. Thermo Fisher and certain of the Diagnostic Labs also work with XIFIN, Inc., a third-party billing company, to show purchasing physicians and laboratories how to improperly bill for the UTM testing panels. Specifically, XIFIN advises providers and labs which ICD-10 and CPT codes to use to induce the Government (and private insurers) to reimburse for medically unnecessary UTI tests. The payments to providers and labs (which without this assistance they would – and should -- never have received) constitute monetary kickbacks and also enable the purchasers to order more UTM testing panels from Thermo Fisher.

**Defendants' Misconduct Results In The Submission Of False Claims To The Government and Private Insurers.**

225. As alleged, commercial diagnostic labs, including the Diagnostic Labs, purchased and utilized Thermo Fisher's Solution for UTI diagnostic tests, which physicians ordered to determine the appropriate antibiotic treatment for their patients.

226. The Diagnostic Labs, the Owners, and the Medical Directors, knew or should have known that the UTI diagnostic tests were medically unnecessary and far more expensive than traditional culture tests.

227. Thermo Fisher was aware, or should have been aware, that physicians and commercial diagnostic labs, including the Diagnostic Labs, would submit claims for payment to Government healthcare programs, including Medicare, Medicare Advantage, Medicaid, and TriCare, as well as to private healthcare insurers in California and Illinois, in connection with Guidance and other Solution-derived UTI tests.

228. The Government, and private healthcare insurers in California and Illinois, have been damaged by the acts and practices of Thermo Fisher, as described above, in presenting, causing to be presented, and conspiring with Pathnostics, the Diagnostic Labs, the Owners, the Medical Directors, and others to present false claims, statements and records to induce the payment for laboratory test panels that were not entitled to payment.

229. Defendants' misconduct was material to the submission of, and payment for, claims relating to the UTI tests.

230. Defendants profited unlawfully from the payment of their false and fraudulent claims for UTI tests.

**<u>The Diagnostic Labs' Copayment and Deductible Waiver Kickback Scheme</u>**

231. The Diagnostic Labs, at the direction and with the knowledge and intent of their Owners and Medical Directors, routinely waived patient cost-sharing obligations and artificially decreased the price of their services in order to induce providers to refer patients to the Diagnostic Labs for medically unnecessary testing and to induce patients to receive it, irrespective of patients' financial hardship.

232. The Diagnostic Labs understood that when referring providers ordered expensive medically unnecessary testing, patients would often sign notifications (such as advance beneficiary notices of noncoverage (ABNs)) informing them that they would have to pay co-pays or even the entire test (which could exceed $1,000.00) out of pocket. Therefore, to induce providers to refer more patients for testing, sales personnel for the Diagnostic Labs, at the direction and with the knowledge of their Owners and Medical Directors, offered routinely to waive copays and deductibles for patients, including Medicare, Medicare Advantage, Medicaid and TriCare-covered patients, as well as the privately-insured. These routine waivers were offered and provided regardless of the individual patient's financial need or economic hardship.

233. This routine practice allowed providers to offer essentially free lab testing to patients in order to encourage them to undergo medically unnecessary testing. To the extent that any patients complained about or refused to submit to the expensive, medically unnecessary procedures, the Diagnostic Labs would waive their copayments and/or deductibles, mark down the amount owed, or simply not bill the patient and write off the receivable.

234. The Diagnostic Labs, with the knowledge and at the direction of their Owners and Medical Directors, also charged referring providers far less than they charged Government and private-pay health insurers for diagnostic tests. These discounted charges enabled providers to "markup" the same tests when directly billing Government healthcare programs and private-pay health insurers. This practice violated the Anti-Markup Rule, and when providers pocketed the mark-up amount, that constituted an illegal kickback.

235. The Diagnostic Labs' offering and providing low cost (or effectively free) services to patients created goodwill among providers' existing and prospective patient base, which resulted in more patients and thus more revenue to the providers.

236. The Diagnostic Labs kickbacks to providers in the form of fee discounts and waivers of copays for privately insured patients were also offered and/or provided in exchange for the providers' agreeing to refer all of their Government-covered patients' diagnostic tests to the Labs.

237. In addition to providing effectively free medical testing, the Diagnostic Labs' waiver of copayments and deductibles also bought the silence of suspicious patients who would otherwise object to, complain about, and/or refuse medically unnecessary testing.

238. The Diagnostic Labs' and Owners'/Medical Directors' practice of routinely waiving copays and deductibles, intentionally foregoing billing and collecting from patients uncovered tests, and discounting the cost of tests which were then billed by providers, violated the Anti-Kickback Statute and the Anti-Markup Rule, and thus, violated the FCA.

**Defendant MicroGenDX's Fraudulent COVID-19 Testing Scheme**

239. Defendant MicroGenDX also engaged in a fraudulent scheme concerning its provision of COVID-19 diagnostic tests in violation of the Federal and State False Claims Acts.

240. Among other healthcare entities and providers, MicroGenDX contracted with Advent Health to provide COVID-19 diagnostic tests using Solution technology.

241. MicroGenDX failed to perform COVID tests accurately and timely as promised, did not properly store specimens, and failed to timely report test results to Advent Health. In many cases, tests results took more than 14 days to get reported.

242. Advent Health sent numerous representatives to MicroGenDX's laboratory facilities to inspect them, but found that their concerns were not addressed or alleviated. Accordingly, Advent canceled more than twenty thousand pending tests. Nevertheless, MicroGenDX billed for the tests.

243. MicroGenDX offered Relator a COVID test ("Respiratory virus molecular detection (non-influenza)") at $80 per test. In forwarding the proposed agreement, the sales rep stated that MicroGenDX's "TAT are 24 hours from receipt of sample." The agreement provided that Relator would be "responsible for securing payment or reimbursement from any third party payor."

## CLAIMS FOR RELIEF

### COUNT I
### False Claims Act: Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)

244. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

245. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

246. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled

to at least $5,000 and up to $11,000[2] for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT II**
**False Claims Act: Making or Using A False Record or Statement to Cause Claim to be Paid 31 U.S.C. § 3729(a)(2)**

247. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

248. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement – *i.e.*, the false certifications and representations made or caused to be made by the defendant – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

249. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT III**
**False Claims Act: Retaining Overpayment 31 U.S.C. § 3729(a)(I)(G)**

250. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

251. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendant has "knowingly ma[de], use[d], or cause[d] to be made or used, a

[2] A 2015 amendment to the False Claims Act authorized the U.S. Department of Justice to periodically inflation-adjust these penalties. Effective May 9, 2022, the minimum penalty is $12,537 and the maximum is $25,076.

false record or statement material to an obligation to pay or transmit money or property to the Government, or knowing conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. § 3729(a)(l).

252. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be detem1ined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT IV**
**California False Claims Act**
**(Cal. Gov't Code § 12650, et seq.)**

253. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

254. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of California.

255. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

256. The California State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continue to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

257. By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

258. Pursuant to the California False Claims and Reporting Act, the State of California is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

**COUNT V**
**California Insurance Frauds Prevention Act – Employment of Runners, Cappers and Steerers or Other Persons to Procure Patients**
**(Cal. Ins. Code § 1871.7(a))**

259. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

260. Pursuant to California Insurance Code § 1871.7(a), is is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure patients for the purpose of submitting a claim to that patient's insurance carrier.

261. Defendants unlawfully incentivized physicians by paying illegal remuneration for purpose of procuring more physicians to order tests, which were ultimately submitted to Medicare, Medicaid, other government programs, and private insurance companies for reimbursements, in violation of Cal. Ins. Code § 1871.7(a).

262. Because the claims submitted to medical insurers by Defendants were procured by runners, cappers, and steerers and other persons, these claims were false and fraudulent under the California Insurance Frauds Prevention Act.

263. This conduct was a substantial factor causing damages alleged herein.

**COUNT VI**
**California Insurance Frauds Prevention Act, Preventing or Causing to be Presented False or Fraudulent Claims for the Payment of An Injury Under a Contract of Insurance**
**(Cal. Ins. Code § 1871.7(b); Cal Pen. Code § 550(a)(1))**

264. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

265. Defendants have all caused to be presented false and fraudulent claims for reimbursement of diagnostic tests, conspired to present or caused to be presented such false and fraudulent claims.

266. These claims were fraudulent because Defendants caused the submission of claims to Medicare, Medicaid, other government programs, and private insurers for medically unnecessary and unreasonable tests. Defendants caused the submission of claims for reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

267. Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

268. This conduct was a substantial factor causing damages alleged herein.

**COUNT VII**
**California Insurance Frauds Prevention Act, Knowingly Preparing or Making Any Writing in Support of a False or Fraudulent Claim**
**Cal. Ins. Code § 1871.7(b); Cal Pen. Code § 550(a)(5)**

269. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

270. Defendants have all either knowingly prepared, made, or subscribed a writing with an intent to present or use it, or to allow it to be presented, in support of false and fraudulent claims for the reimbursement of tests performed on patients, or have aided, abetted, and solicited, or conspired to make, or subscribe such a writing.

271. These writings include bills for payment presented to insurance carriers for payment, and invoices prepared in support of such bills for payment. Such bills for payment constitute false or fraudulent claims because through those bills: Defendants caused the submission of claims to Medicare, Medicaid, other government programs, and private insurers for medically unnecessary and unreasonable tests; and Defendants caused the submission of claims for reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

272. Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

273. This conduct was a substantial factor causing damages alleged herein.

**COUNT VIII**
**California Insurance Frauds Prevention Act, Knowingly Making or Causing to be Made a False or Fraudulent Claim for Payment of a Health Benefit**
**Cal. Ins. Code § 1871.7(b); Cal Pen. Code § 550(a)(6)**

274. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

275. Defendants have all either knowingly presented or caused to be presented false and fraudulent claims for the reimbursement of tests performed on patients, or have aided, abetted, and solicited, or conspired to present or cause to be presented such false and fraudulent claims.

276. These claims were false and fraudulent because: Defendants caused the submission of claims to Medicare, Medicaid, other government programs, and private insurers for medically unnecessary and unreasonable tests; or Defendants caused the submission of claims for reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

277. Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

278. This conduct was a substantial factor causing damages alleged herein.

**COUNT IX**
**California Insurance Frauds Prevention Act, Soliciting, Accepting, and Referring Business to or From an Individual or Entity That Intends to Violate Section 550 of the Penal Code**
**Section 1871.4 of the Insurance Code**
**Cal. Ins. Code § 1871.7(b); Cal Pen. Code § 549**

279. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

280. Defendants have solicited, accepted, or referred business to or from laboratories, physicians, and physician office staff in a manner that violated or intended to violate Section 550 of the Penal Code or Section 1871.4 of the Insurance Code.

281. This conduct was a substantial factor causing damages alleged herein.

**COUNT X**
**Colorado Medicaid False Claims Act**
**(C.R.S. 25.5-4-305, et seq.)**

282. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

283. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Colorado.

284. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

285. The Colorado State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continue to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

286. By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

287. Pursuant to the Colorado Medicaid False Claims Act, the State of Colorado is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XI
## Connecticut False Claims Act
## (Conn. Gen. Stat. §4-274 et seq.)

288. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

289. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for

payment or approval in connection with UTI testing of Medicaid patients in the State of Connecticut.

290. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

291. The Connecticut State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

292. By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

293. Pursuant to the Connecticut False Claims Act, the State of Connecticut is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XII**
**Delaware False Claims and Reporting Act**
**(Del. Code Ann. Tit. 6 §§ 1201, et seq.)**

294. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

295. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Delaware.

296. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

297. The Delaware State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

298. By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

299. Pursuant to the Delaware False Claims and Reporting Act, the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## COUNT XIII
## Florida False Claims Act
## (Fla. Stat. Ann. §§ 68.081, et seq.)

300. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

301. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Florida.

302. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

303. The Florida State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

304. By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

305. Pursuant to the Florida False Claims Act, the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XIV**
**Georgia Taxpayer Protection False Claims Act**
**(Ga. Code Ann.§§ 23-3-120, et seq.)**

306. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

307. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Georgia.

308. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

309. The Georgia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid

and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

310. By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

311. Pursuant to the Georgia Taxpayer Protection False Claims Act, the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XV**
**Hawaii False Claims Act**
**(Haw. Rev. Stat. §§ 661-21, et seq.)**

312. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

313. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Hawaii.

314. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

315. The Hawaii State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

316. By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

317. Pursuant to the Hawaii False Claims Act, the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants

**COUNT XVI**
**Illinois False Claims Act**
**(740 Ill. Comp. Stat. §§ 175/1, et seq.)**

318. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

319. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Illinois.

320. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

321. The Illinois State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

322. By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

323. Pursuant to the Illinois False Claims Act, the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XVII**
**Illinois Insurance Claims Fraud Prevention Act**

324. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

325. The Illinois Insurance Claims Fraud Prevention Act ("Insurance Fraud Act"), 740 ILCS §§ 92/1 *et seq*., provides a civil cause of action against any person who commits the crime of insurance fraud or who "knowingly offer[s] or pay[s] any remuneration, directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer." 740 ILCS § 92/5(a).

326. Under Illinois law, a person commits insurance fraud when he "knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over property of an insurance company . . . by the making of a false claim or by causing a false claims to be made on any policy of insurance issued by an insurance company." 720 ILCS § 5/46-1.

327. Defendants committed insurance fraud by repeatedly, knowingly and intentionally subjected Illinois patients, and patients covered by Illinois insurance companies, to the medically unnecessary UTI PCR testing described herein, and then presented and caused to be presented false claims for payment to Illinois insurance companies in connection with that testing.

328. Defendants further violated the Insurance Fraud Act by engaging in illegal kickback schemes as described herein.

329. The insurance companies, unaware of Defendants' fraudulent acts, paid many of the false claims submitted to them. Had the insurers known of Defendants' fraudulent acts, they would not have paid those false claims. As a result of Defendants' violations of the Insurance Fraud Act, the State of Illinois and its citizens have been damaged in an amount in excess of millions of dollars, exclusive of interest.

**COUNT XVIII**
**Indiana False Claims and Whistleblower Protection Act**
**(Indiana Code§§ 5-11-5.5, et seq.)**

330. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

331. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Indiana.

332. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

333. The Indiana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

334. By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

335. Pursuant to the Indiana False Claims and Whistleblower Protection Act, the State of Indiana is entitled to three times the amount of actual damages plus the maximum penalty for

each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XIX**
**Iowa False Claims Act**
**(Iowa Code § 684.1, et seq.)**

336. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

337. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Iowa.

338. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

339. The Iowa State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

340. By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

341. Pursuant to the Iowa False Claims Act, the State of Iowa is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XX**
**Louisiana Medical Assistance Programs Integrity Law**
**(LA Rev Stat § 46:438.3, et seq.)**

342. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

343. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Louisiana.

344. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

345. The Louisiana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

346. By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

347. Pursuant to the Louisiana's Medical Assistance Programs Integrity Law, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XXI**
**Maryland False Claims Act**
**(Md. Code Ann. Gen. Prov. §§ 8-101, et seq.)**

348. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

349. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Maryland.

By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

350. The Maryland State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

351. By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

352. Pursuant to the Maryland Medicaid False Claims Act, the State of Maryland is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XXII**
**Massachusetts False Claims Act**
**(Mass. Gen. Laws ch. 12, §§ SA, et seq.)**

353. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

354. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the Commonwealth of Massachusetts.

355. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims. The Massachusetts State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

356. By reason of the Defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be detem1ined at trial.

357. Pursuant to the Massachusetts False Claims Act, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**COUNT XXIII**
**Michigan Medicaid False Claim Act**
**Mich. Law Ann. § 400.601, et seq.**

358. Relator repeats and incorporates by reference the allegations above as if fully contained herein.

359. By virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with UTI testing of Medicaid patients in the State of Michigan.

360. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

361. The Michigan State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

362. By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

363. Pursuant to the Michigan Medicaid False Claims Act, the State of Michigan is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants